FILED

2019 MAR 12  AM 9: 38

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY

ORIGINAL

```
 1 | TRACY WILKISON
   | Attorney For United States
 2 | Acting Under Authority Conferred
   | By 28 U.S.C. Section 515
 3 | THOMAS D.COKER
   | Assistant United States Attorney
 4 | Chief, Tax Division
   | ROBERT CONTE
 5 | Assistant United States Attorney
 6 |      300 North Los Angeles Street
   |      Federal Building, Room 7211
 7 |      Los Angeles, California 90012
   |      Telephone: (213) 894-6607
 8 |      Facsimile: (213) 894-0115
   |      E-mail: robert.conte@usdoj.gov
 9 | RICHARD E. ZUCKERMAN
10 | Principal Deputy Assistant Attorney General
   | Tax Division, United States Department of Justice
11 | LARRY J. WSZALEK (WI Bar No. 1003722)
   | Chief
12 | MELISSA S. GRINBERG (WI Bar No. 1023132)
13 | LISA L. BELLAMY (DC Bar No. 495506)
   | Trial Attorneys
14 | Tax Division, Western Criminal Enforcement Section
   | United States Department of Justice
15 |      601 D Street, NW, Room 7022
   |      Washington, D.C. 20004
16 |      Telephone: (202) 514-5762
   |      Facsimile: (202) 514-9623
17 |      E-mail:  larry.j.wszalek@usdoj.gov
18 |               melissa.s.grinberg@usdoj.gov
   |               lisa.l.bellamy@usdoj.gov
19 |
```

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

19 CR 00150 - VAP

| UNITED STATES OF AMERICA, | No. CR 19- |
|---|---|
| Plaintiff, | DEFERRED PROSECUTION AGREEMENT FOR DEFENDANTS |
| v. | MIZRAHI-TEFAHOT BANK LTD.; UNITED MIZARHI BANK |
| MIZRAHI-TEFAHOT BANK LTD.; UNITED MIZRAHI BANK (SWITZERLAND) LTD.; MIZRAHI TEFAHOT TRUST COMPANY LTD.; | (SWITZERLAND) LTD.; MIZRAHI TEFAHOT TRUST COMPANY LTD |
| Defendants. | |

1    The United States Department of Justice, Tax Division, by

2    and through Richard E. Zuckerman, Principal Deputy Assistant

3    Attorney General, Tax Division, U.S. Department of Justice; Larry

4    J. Wszalek, Section Chief, and Melissa S. Grinberg, and Lisa L.

5    Bellamy, Trial Attorneys, Tax Division, United States Department

6    of Justice; and the United States Attorney's Office for the

7    Central District of California, (collectively, the "Government"),

8    and the defendants Mizrahi-Tefahot Bank Ltd., which includes

9    branches in Israel, London, and Los Angeles, CA ("MTB"); United

10   Mizrahi Bank (Switzerland) Ltd. ("UMBS"); and Mizrahi Tefahot

11   Trust Company Ltd. (Mizrahi Trust Company)(collectively "MTB

12   ENTITIES"), by the Chief Legal Advisor of MTB ENTITIES and their

13   undersigned attorneys, pursuant to the authority granted by MTB

14   ENTITIES' Boards of Directors in the form of a Board Resolution,

15   attached hereto as Exhibit A, hereby enter into this Deferred

16   Prosecution Agreement (the "Agreement"). The Agreement: (a) is

17   entered into pursuant to the laws and regulations of the United

18   States, and (b) does not bind and shall not apply to any individual

19   or entity other than MTB ENTITIES as set forth herein.

20   **THE CRIMINAL INFORMATION AND CERTAIN DEFINITIONS**

21       1.   MTB ENTITIES shall waive indictment and consent to the

22   filing of a one-count Information (the "Information") in the United

23   States District Court for the Central District of California,

24   Western Division (the "Court") charging that certain employees of

25   MTB ENTITIES agreed with U.S. taxpayer-customers, and with others

26   known and unknown to the Government, to defraud the United States

27   and a government agency thereof, namely, the Internal Revenue

28

1  Service ("IRS"), in violation of 18 U.S.C. § 371. A copy of the
2  Information is attached hereto as Exhibit B.

3      2.    The Entry Date is the date that the Court enters the
4  Speedy Trial Act Order (the "Entry Date").

5  **ACCEPTANCE OF RESPONSIBILITY**

6      3.    MTB ENTITIES acknowledge and accept that, among other
7  acts, as set forth more fully in the Statement of Facts, attached
8  hereto as Exhibit C, certain private bankers, relationship
9  managers, and other employees of MTB ENTITIES with similar levels
10 of responsibility did the following:

11     A.    Beginning in 2002 and continuing until 2012,
12 assisted or otherwise facilitated a number of U.S. taxpayers in
13 maintaining undeclared accounts at one or more of the MTB ENTITIES'
14 branches by: (1) opening and/or maintaining foreign nominee bank
15 accounts for certain U.S. clients holding U.S. securities, which
16 enabled those U.S. taxpayers to evade U.S. reporting requirements
17 on earnings from securities, in violation of MTB's Qualified
18 Intermediary Agreement ("QI Agreement") with the IRS; and (2)
19 referring U.S. beneficial owners of accounts to outside advisors to
20 set up offshore entities to act as nominee account holders, which
21 enabled those U.S. taxpayers to conceal their beneficial ownership
22 in the accounts;

23     B.    Opened accounts for known U.S. customers using non-
24 U.S. forms of identification, which enabled U.S. taxpayers to avoid
25 being identified as U.S. persons;

26     C.    Maintained customer accounts without copies of the
27 required identification and account opening documents, in violation

28

1    of MTB internal bank policy, which enabled their U.S. customers to

2    avoid being identified as U.S. persons;

3           D.    Entered into "hold mail" agreements with U.S.

4    customers whereby MTB and UMBS employees held bank statements and

5    other account-related mail in their offices in Israel and

6    Switzerland, and by doing so enabled documents reflecting the

7    existence of the offshore accounts to remain outside the U.S.;

8           E.    Failed to block, in a timely manner, trading in U.S.

9    securities in certain non-compliant accounts controlled by U.S.

10   customers without obtaining the proper IRS Forms W-8BEN and/or W-9

11   per MTB's QI Agreement with the IRS; and

12          F.    Until 2008, provided U.S. customers at MTB-Los

13   Angeles access to and use of their funds held in non-U.S. MTB and

14   UMBS accounts through back-to-back loans, while excluding any

15   record of the U.S. customer's offshore pledge accounts at MTB or

16   UMBS, which allowed certain U.S. customers to take advantage of

17   Israeli and Swiss privacy laws and not disclose their pledge

18   accounts to U.S. tax authorities.

19      4.   MTB ENTITIES admit, accept, and acknowledge that they are

20   responsible under U.S. law for the acts and omissions of their

21   employees, as set forth in the Statement of Facts and herein.

22      5.   MTB ENTITIES represent to the Government that the

23   Agreement, the Information, the Statement of Facts, and all other

24   exhibits to the Agreement were reviewed by their respective Boards

25   of Directors and any officer, employee or agent, whose review was

26   deemed necessary by MTB ENTITIES to enter into the Agreement.

27      6.   MTB ENTITIES admit and stipulate that the facts set forth

28   in the Statement of Facts, attached hereto as Exhibit C and

incorporated herein, are true and accurate based upon MTB ENTITIES'
internal investigation and information provided to MTB ENTITIES by
the Government.  In sum, MTB ENTITIES admit that they are
responsible under United States *respondeat superior* law for the
acts of their employees.

### RESTITUTION, DISGORGEMENT AND PENALTY OBLIGATIONS

7.    As a result of the conduct described in the Statement of
Facts, MTB ENTITIES agree to make payments in total of $195,000,000
to the United States. Specifically, MTB ENTITIES agree to (1) make
a payment of restitution in the amount of $53,000,000(the "Tax
Restitution Amount"), (2) pay disgorgement to the United States of
$24,000,000 (the "Disgorgement Amount"), and (3) pay a penalty of
$118,000,000(the "Penalty Amount") to the United States, as set
forth below.

8.    In regard to the Tax Restitution Amount, MTB ENTITIES
admit that the Tax Restitution Amount represents the approximate
unpaid pecuniary loss to the United States as a result of the
conduct described in the Statement of Facts.  The Tax Restitution
Amount shall not be further reduced by payments that have been made
or may be made to the United States by U.S. taxpayers through the
Offshore Voluntary Disclosure Initiative and similar programs
(collectively, "OVDI"), existing before or if subsequently
promulgated after the date of the Agreement.  MTB ENTITIES agree to
pay the Tax Restitution Amount to the IRS by wire transfer within
thirty (30) days of the Entry Date.  If MTB ENTITIES fail to timely
make the payment required under this paragraph, interest, at the
rate specified in 28 U.S.C. § 1961, shall accrue on the unpaid
balance through the date of payment, unless the Government, in its

sole discretion, chooses to reinstate prosecution pursuant to

Paragraphs 29 and 30, below. The failure to timely make payment

constitutes a material breach of the Agreement.

9.    In regard to the Disgorgement Amount, MTB ENTITIES agree

that the Disgorgement Amount of $24,000,000 represents the

approximate gross fees paid to MTB ENTITIES by U.S. taxpayers with

undeclared accounts at MTB ENTITIES from 2002 through 2012. The

Disgorgement Amount shall be sent by wire transfer to a seized

asset deposit account maintained by the United States Department of

the Treasury within thirty (30) days of the Entry Date. If MTB

ENTITIES fail to timely make the payment required under this

paragraph, interest, at the rate specified in 28 U.S.C. § 1961,

shall accrue on the unpaid balance through the date of payment,

unless the Government, in its sole discretion, chooses to reinstate

prosecution pursuant to Paragraphs 29 and 30, below. The failure to

timely make payment constitutes a material breach of the Agreement.

10.   MTB ENTITIES agree to pay the Penalty Amount of

$118,000,000 as directed by the Government within thirty (30)

business days of the Entry Date. The failure to timely make payment

constitutes a material breach of the Agreement. In mitigation of a

higher penalty, MTB ENTITIES represented that they conducted an

internal investigation and engaged in concomitant efforts to

provide information and materials, consistent with applicable laws

and regulations, derived from that investigation to U.S.

authorities.  The Penalty Amount is final and shall not be

refunded.  Furthermore, Nothing in the Agreement shall be deemed an

agreement by the Government that the Penalty Amount is the maximum

penalty that may be imposed in any future prosecution, and the

Government is not precluded from arguing in any future prosecution that the Court should impose a higher penalty. The Government agrees, however, that in the event of a material breach of the Agreement and a subsequent prosecution against MTB ENTITIES, the Government shall recommend to the Court that MTB ENTITIES' payment of the Penalty Amount, pursuant to the Agreement, be credited toward any payment ordered by the Court as part of any judgment.

11.  Upon payment of the Disgorgement Amount, MTB ENTITIES shall release any and all claims they may have to such funds and execute such documents as necessary to accomplish the transfer of the funds. MTB ENTITIES agree that they will not file a claim with any court or otherwise contest the payment of the Disgorgement Amount or the Penalty Amount and will not assist a third party in asserting any claim to the Disgorgement Amount or the Penalty Amount.

12.  MTB ENTITIES agree that the Tax Restitution Amount, the Disgorgement Amount, and the Penalty Amount shall be treated as non-tax-deductible amounts, for all tax purposes under United States law. MTB ENTITIES agree that they will not claim, assert, or apply for, either directly or indirectly - such as through a subsidiary or affiliate, foreign or domestic, a tax deduction, tax credit, or any other offset with regard to any United States federal, state, or local tax, for any portion of the $195,000,000 that MTB ENTITIES have agreed to pay to the United States pursuant to the Agreement.

## HEIGHTENED STANDARDS FOR FATCA COMPLIANCE

13.   MTB agrees to ensure that: (a) all of its "subsidiaries and affiliates," defined as overseas branches and other companies majority owned and controlled by MTB, that provide financial services to customers and are covered by the Foreign Account Tax Compliance Act, 26 U.S.C. §§ 1471-1474 ("FATCA"), to the extent required by FATCA, (other than MTB-Los Angeles), have entered or shall enter into a foreign financial institution agreement ("FFI") pursuant to the implementation of FATCA; and (b) all of its majority owned and controlled subsidiaries and affiliates that provide financial services to customers and are covered by FATCA shall continue to implement and maintain an effective program of internal controls with respect to compliance with FATCA in their affiliates and subsidiaries (the "FATCA Compliance Program"). MTB shall ensure that the FATCA Compliance Program includes, but is not necessarily limited to, the following measures, a number of which MTB ENTITIES have represented to the Government have already been implemented:

A.   The appointment of a Chief Compliance Officer as the Global Head of Cross-Border Compliance, reporting directly to the Chief Risk Officer or Deputy Chief Executive Officer of MTB, who shall make periodic reports on FATCA to the Audit Committee of MTB's Board of Directors;

B.   The employment of a designated FATCA Coordinator at MTB ENTITIES, who reports to MTB's Chief Compliance Officer;

C.   The appointment of a FATCA Compliance Officer at each affiliate and subsidiary, who shall be responsible for compliance with FATCA and shall report to each subsidiary's or

affiliate's Compliance Officer (if not the same employee), who shall in turn report directly to the Audit Committee of the Board of Directors of each affiliate or subsidiary or directly to the Board of Directors, in entities which do not have an Audit Committee. Each affiliate and subsidiary's Compliance Officer shall in turn report its FATCA compliance to MTB's Chief Compliance Officer, who shall in turn report to the Audit Committee of MTB.

D.   The continued development and implementation of enhanced controls to identify, prevent, detect, and correct any material failures regarding MTB ENTITIES' compliance with FATCA;

E.   The continued development and implementation of periodic training of relevant personnel with respect to FATCA compliance; and

F.   The continued development and implementation of policies and procedures for receiving and investigating allegations of material failures of FATCA-related internal controls.

14.   In addition to the FATCA Compliance Program, MTB shall implement a revised governance structure for the compliance functions. Within this new framework, the Chief Risk Officer shall have professional responsibility and authority over the compliance functions that advise the different business divisions, including the International Activities & Private Banking Sector. The Chief Risk Officer shall also have authority to address issues of importance to MTB ENTITIES, and shall have substantial input with respect to compensation and promotion matters for divisional level compliance personnel within the framework established by the compensation policies of MTB and its subsidiaries and affiliates.

15.   MTB ENTITIES agree to close or block any and all accounts of "Recalcitrant Account Holders" as defined in 26 U.S.C. § 1471(d)(6), to the extent permitted under the applicable law in the relevant jurisdiction. The development and implementation of the FATCA-related measures described in Paragraphs 13 and 14 of the Agreement shall include procedures designed to prevent any of MTB ENTITIES' employees from assisting Recalcitrant Account Holders to engage in acts of concealment of assets and income in connection with closing any account or transferring any funds. MTB ENTITIES shall design and implement measures to ensure that MTB ENTITIES shall not open any U.S. Related Accounts except on conditions that ensure that the accounts shall be declared to the United States and shall be subject to disclosure to the United States by MTB ENTITIES to the extent required by FATCA.

16.   With respect to MTB-Los Angeles, MTB-Los Angeles agrees to provide the Government with periodic reports identifying how many loans, if any, issued by MTB-Los Angeles that are collateralized by offshore MTB ENTITIES' accounts, or accounts of any foreign affiliate of the MTB ENTITIES. The periodic reports shall further affirm that MTB-Los Angeles is fully compliant with applicable anti-money laundering regulations regarding such loans and that the relevant foreign affiliate has confirmed that the related foreign account is FATCA-compliant. The periodic reports shall be due on the two-month anniversary of the Entry Date,  and every one hundred eighty (180) days thereafter until the end of the Deferral Period. The "Deferral Period" is defined as beginning on the Entry Date and ending on the date of dismissal of the

Indictment, a period of two (2) years, subject to extension as set forth in the Agreement.

### OBLIGATIONS TO COOPERATE

17.   MTB ENTITIES agree, subject to applicable laws and regulations, that during the Deferral Period (including such additional time as necessary pursuant to the provisions of paragraph 27), they shall fully cooperate with the Government, the IRS, and any other U.S. governmental agency designated by the Government regarding any investigation relating to the conduct described in the Statement of Facts ("Government Investigation") about which MTB ENTITIES have information or knowledge.

18.   MTB ENTITIES agree and understand that during the Deferral Period, MTB ENTITIES shall, subject to applicable laws and regulations and upon request, with regard to a Government Investigation:

A. Truthfully and completely disclose all information in their possession, custody, and control with respect to the activities of MTB ENTITIES, their employees, and others concerning all such matters about which the Government inquires related to the Government  Investigation, which information can be used for any purpose, except as limited by the Agreement;

B. Cooperate fully with the Government, the IRS, and any other law enforcement agency so designated by the Government in connection with any investigation, criminal prosecution, or civil proceeding brought by the Government arising out of the conduct set forth in the Information or the Statement of Facts or relating in any way to the Government Investigation of the cross-border business of MTB ENTITIES;

C. Consent to the production to the Government of any document, record, or other tangible evidence relating to conduct that is the subject of the Government Investigation;

D. Specifically provide, upon request, all items, assistance, information and documents required to be produced by Swiss banks participating in the Program for Non-Prosecution Agreements or Non-Target Letters for Swiss Banks (the "Program") as set forth specifically in Parts II.D.1,2 and 4 and Part II.F of the Program;

E. With respect to transaction information pursuant to Part II.D.2.b.vi of the Program shall additionally produce such information, as soon as practicable, for all accounts closed in the period from January 1, 2009 through October 2017;

F. Undertake the retention of records as set forth in Parts II.D.5 and II.E of the Program;

G. Implement the closure or blockage of recalcitrant accounts and related procedures, to the extent that they have not already done so, as set forth in Part II.G of the Program and as otherwise consistent with Israeli law;

H. Shall, at the Government's request, use their best efforts to secure the attendance and truthful statements or testimony of any employee, or former employee, at any meeting or interview or before the grand jury or at any trial or other court proceeding, to the extent permitted by applicable law; and

I. Shall commit no violations of the federal criminal laws of the United States.

19.   Under the terms of the Agreement, MTB ENTITIES shall truthfully and completely disclose, and continue to disclose during

the term of the Agreement, consistent with applicable law and regulations, all material information described in Part II.D.1 of the Swiss Bank Program with respect to U.S. Related Accounts held by MTB ENTITIES from 2002 through 2012 (as those terms are defined in the Program) that is not protected by a valid claim of privilege or work product with respect to the activities of MTB ENTITIES and their employees, consultants, and others, which information can be used for any purpose, except as otherwise limited in the Agreement. Subject to applicable laws and regulations, MTB ENTITIES shall disclose to the Government that it has discovered new material information required to be disclosed under the Agreement, including pursuant to this paragraph and Paragraph 20, within thirty (30) days of discovery and provide the material information required to be disclosed pursuant to the Agreement, including information as described in Part II.D.1 of the Program and information pursuant to Paragraph 18(d) and (e) of the Agreement, within ninety (90) days of discovery to the Government. All other terms of the Agreement shall apply with respect to any newly disclosed account.

20. It is further understood that during the Deferral Period MTB ENTITIES will bring to the Government's attention:

A. All criminal conduct by, and criminal investigations of, MTB ENTITIES or their employees, officers, or directors acting within the scope of their employment, related to any violations of the federal laws of the United States that come to the attention of MTB ENTITIES; its Boards of Directors; Executitve Boards; or Senior Management; and

B. Any administrative or regulatory proceeding (excluding routine proceedings) or civil action brought or

13

investigation conducted by any U.S. governmental authority that alleges fraud by MTB ENTITIES or any other violations of the federal laws of the United States in the operation or management of MTB ENTITIES' business.

21.   Nothing in this Agreement shall require MTB ENTITIES to waive any of the protections of the attorney-client privilege, attorney work-product doctrine, or any other applicable privilege unless MTB ENTITIES voluntarily chooses to waive any such privilege. Nothing in this Agreement shall require MTB ENTITIES to violate the law of any jurisdiction in which they operate.

**COOPERATION, DEFERRAL OF PROSECUTION, AND DURATION OF THE AGREEMENT**

22.   The Government acknowledges that MTB ENTITIES have provided cooperation concerning the Government's investigation of MTB ENTITIES' cross-border business with U.S. taxpayers, and that these actions demonstrate acceptance of responsibility for the conduct set forth herein and set forth in the Statement of Facts, including, among other actions:

A.   Conducted an extensive internal investigation of MTB ENTITIES' conduct, including the collection and review of thousands of documents and millions of e-mails from three countries, and produced over 560,000 pages of documents to the Government.

B.   Provided translations of many documents, conducted internal interviews, and through counsel, proffered the substance of internal interviews conducted by counsel with MTB ENTITIES' employees and management, and made presentations to the Government regarding the results of their internal investigation.

C.    Coordinated the interviews of two bank employees located in Israel and various MTB ENTITIES' employees available for in-person and telephonic interviews and produced a custodial witness from Israel to testify at the trial of a former MTB employee in the United States.

D.    Engaged KPMG LLP ("KPMG") as an independent forensic and accounting expert to review and validate a database created by the MTB ENTITIES that consolidated 1.5 billion records from eight separate systems within MTB ENTITIES to analyze data regarding the U.S. Related Accounts.

E.    Had KPMG make multiple in-person presentations to the Government supporting KPMG's data collection and analysis of U.S. Related Accounts and cooperated in providing the production of additional explanatory materials at the Government's request.

F.    Assisted the Government in connection with requests under the Tax Treaty and the Mutual Legal Assistance Treaty request to Israel. MTB ENTITIES also provided account summaries for each of the U.S. Related Accounts at UMBS.

G.    Litigated and appealed in the Swiss courts in an attempt to obtain permission to disclose two UMBS employee identities and documents for production to the Government.

23.   MTB ENTITIES have also made a commitment to:

A.    Accept and acknowledge responsibility for their employees' conduct, as described in the Statement of Facts;

B.    Cooperate with the Government and the IRS;

C.    Make the payments specified in the Agreement;

D.    Comply with the federal criminal laws of the United States (as provided herein in Paragraph 18); and

E.   Otherwise comply with all of the terms of the Agreement. In consideration of the foregoing, the Government shall recommend to the Court that prosecution of MTB ENTITIES on the Information be deferred for two (2) years from the Entry Date, (the "Deferral Period").   MTB ENTITIES shall expressly waive indictment and all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Central District of California for the Deferral Period. MTB ENTITIES also hereby agree to waive all rights, whether asserted directly or by a representative, legal or otherwise, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552, or the Privacy Act, Title 5, United States Code, Section 552, except as provided by Fed. R. Crim. P. 16, Fed. R. Crim. P. 26, or 18 U.S.C. § 3500. MTB ENTITIES' agreement to the provisions of this paragraph shall expire upon any further prosecution of any of the MTB ENTITIES by the Government in connection with this matter, but in no event earlier than two (2) years from the Entry Date of the Agreement.

24.   MTB ENTITIES agree that their obligations pursuant to the Agreement, which shall commence upon the Entry Date, will continue for the Deferral Period, unless otherwise extended pursuant to Paragraph 27 below.   MTB ENTITIES' obligation to cooperate

1  terminates in the event the Government files a prosecution against

2  MTB ENTITIES.

3      25.  The Government agrees that if MTB ENTITIES are in

4  substantial compliance with all of their obligations under the

5  Agreement, the Government shall, at the expiration of the Deferral

6  Period (including any extensions thereof), seek dismissal with

7  prejudice of the Information filed against MTB ENTITIES pursuant to

8  the Agreement.  Except in the event of a material breach by MTB

9  ENTITIES of any term of the Agreement or as otherwise provided in

10  Paragraphs 28, 29 and 30, the Government will bring no additional

11  charges or other civil action against MTB ENTITIES relating to

12  their conduct as described in the Statement of Facts.  The

13  Agreement does not provide any protection against prosecution for

14  any crimes except as set forth above and does not apply to any

15  individual or entity other than MTB ENTITIES.

16      26.  MTB ENTITIES and the Government understand that the

17  Agreement to defer prosecution of MTB ENTITIES must be approved as

18  to waiver of the requirements of the Speedy Trial Act by the Court,

19  in accordance with 18 U.S.C. § 3161(h)(2).  Should the Court

20  decline to approve the Agreement to defer prosecution for any

21  reason: (a) both the Government and MTB ENTITIES are released from

22  any obligation imposed upon them by the Agreement; (b) the

23  Agreement shall be null and void, except for the tolling provision

24  set forth in Paragraphs 30, 31 and 32, below; and (c) if they have

25  already been transferred to the United States, the Tax Restitution

26  Amount, the Disgorgement Amount and the Penalty Amount shall be

27  returned to MTB ENTITIES within 30 business days.

28

27.   MTB ENTITIES agree that, in the event that the Government determines during the Deferral Period, described in Paragraph 16 or any extensions thereof, that any of the MTB ENTITIES have knowingly committed a material breach of any provision of the Agreement, an extension of the Deferral Period may be imposed, in the sole discretion of the Government, up to an additional two (2) years, but in no event shall the total term of the deferral-of-prosecution period of the Agreement exceed four (4) years.   MTB ENTITIES, however, shall cooperate fully with the Government in any and all matters related to the conduct described in the Agreement and the Statement of Facts, until the date on which all civil or criminal examinations, investigations, or proceedings, including all appeals, are concluded, whether those examinations, investigations, or proceedings are concluded within the maximum four-year term of the Agreement or beyond the four (4) years.

## **ADDITIONAL PROVISIONS**

28.   It is understood that the Government has the sole discretion to determine that MTB ENTITIES:

      A.   Have knowingly given materially false, incomplete or misleading information to the Government either during the term of the Agreement or in connection with the Government's investigation of the conduct described in the Statement of Facts;

      B.   Committed any crime under the federal laws of the United States subsequent to the execution of the Agreement; or

      C.   Otherwise knowingly violated any material provision of the Agreement.

29.   If the Government makes a determination, pursuant to Paragraph 28, within the Deferral Period, then the MTB ENTITIES

shall, in the Government's sole discretion, thereafter be subject
to prosecution for any federal criminal violation, or suit for any
civil cause of action, of which the Government has knowledge,
including but not limited to a prosecution or civil action based on
the Information, the Statement of Facts, the conduct described
therein, or perjury and obstruction of justice.  Any such
prosecution or civil action may be premised on any information
provided by or on behalf of MTB ENTITIES to the Government or the
IRS at any time.

30.  In any prosecution or civil action based on the
Information, the Statement of Facts, or the conduct described
therein, it is understood that:

A.  no charge would be time-barred provided that such
prosecution is brought within the applicable statute of limitations
period (subject to any prior tolling agreements between the
Government and MTB ENTITIES), and excluding the period from the
execution of the Agreement, the Execution Date, until its
termination; and

B.  MTB ENTITIES agree to tolling, and exclusion from
any calculation of time, the running of the statute of limitations
for the length of the Agreement starting from the date of the
execution of the Agreement, the Execution Date, and including any
extension of the period of deferral of prosecution pursuant to
Paragraph 27 above.  By the Agreement, MTB ENTITIES expressly
intend to and hereby do waive their rights in the foregoing
respects, including any right to make a claim premised on the
statute of limitations, as well as any constitutional, statutory,
or other claim concerning pre-indictment delay.  Such waivers are

1  knowing, voluntary, and in express reliance on the advice of MTB
2  ENTITIES' counsel.

3      31.  It is further agreed that in the event that the
4  Government, in its sole discretion, determines that MTB ENTITIES
5  have knowingly violated any material provision of the Agreement in
6  a material respect, including by failure to meet their obligations
7  under the Agreement:

8          A.  all statements made by or on behalf of MTB ENTITIES
9  to the Government or the IRS, including but not limited to the
10 Statement of Facts, or any testimony given by MTB ENTITIES, their
11 employees, or by any agent of MTB ENTITIES before a grand jury or
12 elsewhere, whether before or after the date of the Agreement, or
13 any leads from such statements or testimony, shall be admissible in
14 evidence in any and all criminal proceedings hereinafter brought by
15 the Government against MTB ENTITIES; and

16         B.  MTB ENTITIES shall not assert any claim under the
17 United States Constitution, Rule 11(f) of the Federal Rules of
18 Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or
19 any other federal rule, that statements made by or on behalf of MTB
20 ENTITIES before or after the date of the Agreement, or any leads
21 derived therefrom, should be suppressed or otherwise excluded from
22 evidence.

23     32.  It is the intent of the Agreement to waive any and all
24 rights in the foregoing respects.

25     33.  MTB ENTITIES, having admitted to the facts in the
26 Statement of Facts, agree that they shall not, through their
27 attorneys, or employees, make any public statement, in litigation
28 or otherwise, contradicting the Statement of Facts or their

1   representations in the Agreement; provided, however, that the

2   restrictions set forth in this paragraph are not intended to and

3   shall not apply to any current or former employee of MTB ENTITIES,

4   or any other individual, in the course of any non-U.S. criminal,

5   regulatory, or civil case, investigation, or other proceeding, as

6   long as the individual does not speak on behalf of any of MTB

7   ENTITIES in such proceedings.   However, nothing in this paragraph

8   or this Agreement is meant to affect the obligation of MTB ENTITIES

9   or their employees to testify or respond truthfully to the best of

10   their personal knowledge and belief in any proceeding or in

11   response to questions from a non-U.S. government entity.   Any such

12   contradictory statement by MTB ENTITIES, their present or future

13   attorney(s) or authorized employees shall constitute a material

14   breach of the Agreement and MTB ENTITIES thereafter shall be

15   subject to prosecution as specified in Paragraphs 29, 30, and 31,

16   above, or the deferral-of-prosecution period shall be extended

17   pursuant to Paragraph 27, above.   The decision as to whether any

18   such contradictory statement will be imputed to MTB ENTITIES for

19   the purpose of determining whether MTB ENTITIES has violated the

20   Agreement shall be within the sole discretion of the Government.

21   Upon the Government's notifying MTB ENTITIES of any such

22   contradictory statement, MTB ENTITIES may avoid a finding of a

23   material breach of the Agreement by repudiating such statement both

24   to the recipient of such statement and to the Government within

25   three (3) calendar days after having been provided notice by the

26   Government.   MTB ENTITIES consent to the public release by the

27   Government, in its sole discretion, of any such repudiation.   The

28   Government agrees that nothing in this Agreement in any way

prevents MTB ENTITIES from taking good faith positions in non-U.S. investigations or non-U.S. litigation involving private parties or foreign government entities (including class actions and derivative actions), including asserting defenses and affirmative defenses.

34.   MTB ENTITIES agree that it is within the Government's sole discretion to choose, in the event of a material breach, the remedies contained in Paragraphs 29 and 30 above, or instead to choose to extend the period of deferral of prosecution pursuant to Paragraph 27.   MTB ENTITIES understand and agree that the exercise of the Government's discretion under the Agreement is unreviewable by any court.   Should the Government determine that MTB ENTITIES have committed a material breach of this Agreement, the Government shall provide prompt written notice to MTB ENTITIES addressed to their Chief Legal Advisor, and to MTB ENTITIES' counsel, John F. Libby, Esq. of Manatt, Phelps & Phillips, LLP, 11355 W. Olympic Blvd., Los Angeles, California, 90064, and F. Joseph Warin, Esq., of Gibson, Dunn & Crutcher LLP, 1050 Connecticut Ave., NW, Washington, District of Columbia, 20036, or to any successor MTB ENTITIES may designate, of the alleged material violation and provide MTB ENTITIES with a forty-five-day period from the date of receipt of notice in which to make a presentation to the Government, to demonstrate that no material breach occurred, or, to the extent applicable, that the material breach should not result in the exercise of those remedies or in an extension of the period of deferral of prosecution, including because the material breach has been cured by MTB ENTITIES.

**LIMITS OF THE AGREEMENT**

35.   It is understood that the Agreement is solely binding on the Government, and does not bind any other federal agencies, any state or local law enforcement agencies, any licensing authorities, or any regulatory authorities.  However, if requested by MTB ENTITIES or their attorneys, the Government will bring to the attention of any such agencies, including but not limited to any regulators, as applicable, the Agreement, the cooperation of MTB ENTITIES,  their compliance with their obligations under the Agreement, and any remedial steps specified in or implemented pursuant to this Agremeent.

**PUBLIC FILING**

36.   The Government and MTB ENTITIES agree that, upon the submission of the Agreement (including the Statement of Facts and other attachments) to the Court, the Agreement and its attachments shall be filed publicly in the proceedings in the United States District Court for the Central District of California.  MTB ENTITIES shall be entitled to file relevant information relating to the Agreement, the Statement of Facts, and the Information in connection with legal obligations or proceedings in the State of Israel or the Swiss Confederation.

37.   The parties understand that the Agreement reflects the unique facts of this case and is not intended as precedent for other cases.

**EXECUTION IN COUNTERPARTS**

38.   The Agreement may be executed in one or more counterparts, each of which shall be considered effective as an original signature.

## INTEGRATION CLAUSE

39.   The Agreement sets forth all the terms of the Deferred Prosecution Agreement between MTB ENTITIES and the Government.   The Agreement supersedes all prior understandings or promises between the Government and MTB ENTITIES.   No modifications or additions to the Agreement shall be valid unless they are in writing and signed by the Government, MTB ENTITIES' attorneys, and a duly authorized representative of MTB ENTITIES.

AGREED AND ACCEPTED

Respectfully submitted,

RICHARD E. ZUCKERMAN
Principal Deputy Assistant
Attorney General
Tax Division

LARRY J. WSZALEK
Chief
MELISSA S. GRINBERG
LISA L. BELLAMY
Trial Attorneys
U.S. Department of Justice
Tax Division

TRACY L. WILKERSON
Attorney For United States
Acting Under Authority Conferred
By 28 U.S.C. Section 515
THOMAS D. COKER
Assistant United States Attorney
Chief, Tax Division

//
//
//

1   MIZRAHI-TEFAHOT BANK LTD.;
    UNITED MIZRAHI BANK (SWITZERLAND) LTD.;
2   MIZRAHI TEFAHOT TRUST COMPANY LTD.,
    Defendants
3

4
    By: _____          3-12-2019.
5
    CHIEF LEGAL ADVISOR                     Date
6   MIZRAHI-TEFAHOT BANK LTD.

7   _____               3-12-2019
8   JOHN F.LIBBY, Esq.                      Date
    Counsel for Defendants
9   MIZRAHI-TEFAHOT BANK LTD.;
    UNITED MIZRAHI BANK (SWITZERLAND) LTD.;
10  MIZRAHI TEFAHOT TRUST COMPANY LTD.

11  _____               3-12-2019
12  F. JOSEPH WARIN, Esq.                   Date
    Counsel for Defendants
13  MIZRAHI-TEFAHOT BANK LTD.;
    UNITED MIZRAHI BANK (SWITZERLAND) LTD.;
14  MIZRAHI TEFAHOT TRUST COMPANY LTD.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                            25

EXHIBIT A TO DEFERRED PROSECUTION AGREEMENT

## RESOLUTION OF THE BOARD OF DIRECTORS OF MIZRAHI TEFAHOT BANK LTD.

At a duly held meeting held on March 12, 2019, the Board of Directors of Mizrahi Tefahot Bank Ltd. (the "Bank") resolved as follows:

**WHEREAS**, the Bank; United Mizrahi Bank (Switzerland) Ltd.; and Mizrahi Tefahot Trust Company Ltd. (collectively, "MTB Entities") have been engaged in discussions with the United States Department of Justice ("DOJ") regarding certain tax-related issues arising out of, in connection with, or otherwise relating to the conduct of the U.S. cross-border business by the MTB Entities;

**WHEREAS**, in order to resolve such discussions, it is proposed that the MTB Entities enter into a certain deferred prosecution agreement with the DOJ ("Agreement");

**WHEREAS**, the Bank's outside counsel have advised the Board of Directors of the Bank's rights, possible defenses, and the consequences of entering into such Agreement with the DOJ, and have further recommended entry into the Agreement with the DOJ; and

**WHEREAS**, an Independent Committee of the Board has exercised its own judgment and recommended to the Board that it approve the Agreement with the DOJ;

This Board hereby **RESOLVES** that:

1.   The Board of Directors of the Bank has reviewed the Agreement including the Statement of Facts (attached as Exhibit C to the Agreement) and the Information (attached as Exhibit B to the Agreement) and voted to enter into the Agreement;

2.   The Bank (i) consents to the filing in the United States District Court for the Central District of California of an Information charging the MTB Entities with one count of conspiracy in violation of 18 U.S.C. § 371 to defraud the United States and its agency the Internal Revenue Service in connection with the conduct of its U.S. cross-border business as set forth more fully in the Information, through the actions of certain of their private bankers, relationship managers, and other employees with similar levels of responsibility, and (ii) together with the other MTB Entities, agrees to pay an amount no greater than $195,000,000 in connection with the execution of the Agreement described in paragraph 3 below and to execute the ongoing obligations described therein;

3.   The Chief Legal Advisor, or her delegate, hereby is authorized on behalf of the Bank to execute the Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such non-material changes as the Chief Legal Advisor, or her delegate, may approve; and

4.   All of the actions of the Chief Legal Advisor of the Bank, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the

**EXHIBIT A**

adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Bank.

5.      The Board takes note that the Chief Legal Advisor of the Bank was also authorized by the Boards of Directors of the other MTB Entities to execute the Agreement on their behalf, after each board reviewed the Agreement including the Statement of Facts and the Information, and voted to enter into the Agreement.

        **IN WITNESS WHEREOF**, the Board of Directors of the Bank has executed this Resolution effective as of the day and year first written above.

_U. Feller_

Corporate Secretary

2

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. Case No. CR 19- |
| Plaintiff, | I N F O R M A T I O N |
| v. | [18 U.S.C. § 371: Conspiracy to Defraud the United States] |
| MIZRAHI-TEFAHOT BANK, LTD.; UNITED MIZRAHI BANK (SWITZERLAND) LTD.; and MIZRAHI TEFAHOT TRUST COMPANY, LTD., | |
| Defendants. | |

The United States Attorney charges:

COUNT ONE

[18 U.S.C. §371]

At all times relevant to this Information:

A.   INTRODUCTORY ALLEGATIONS

1.   Defendant MIZRAHI-TEFAHOT BANK, LTD. ("MTB") was a public company, registered with the Registrar of Companies in Israel and traded on the Tel-Aviv Stock Exchange.                **EXHIBIT B**

2.    Defendant MTB was headquartered in Israel and had non-Israeli branches in London, the Cayman Islands, and Los Angeles. Defendant MTB wholly owned and controlled subsidiary MIZRAHI INTERNATIONAL HOLDING COMPANY LTD., which in turn wholly owned and controlled defendant UNITED MIZRAHI BANK (SWITZERLAND) LTD. ("UMBS") with one location in Zurich, Switzerland. Defendant MTB wholly owned and controlled defendant MIZRAHI TEFAHOT TRUST COMPANY LTD. ("Mizrahi Trust Company").

3.    The Internal Revenue Service ("IRS") was an agency of the United States Department of Treasury responsible for administering and enforcing the tax laws of the United States and collecting the taxes owed to the Treasury of the United States.

4.    United States citizens, resident aliens, and legal permanent residents had an obligation to report the following information to the IRS on Form 1040, Schedule B, Part III, Line 7a, by checking a "Yes" or "No" box:  "At any time during [the calendar year], did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?" If the answer to Line 7a was "Yes," then Line 7b required the taxpayer to enter the name of the foreign country in which the financial account was located.

5.    United States citizens, resident aliens, and legal permanent residents had an obligation to report all income earned from foreign financial accounts on their tax returns and to pay the taxes due on that income.

6.     United States citizens, resident aliens, and legal permanent residents, who had a financial interest in, or signature authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a particular year were required to file with the Department of the Treasury a Report of Foreign Bank and Financial Accounts ("FBAR"). Generally, prior to 2016, the FBAR for the applicable year was due by June 30 of the following year.

7.     On January 21, 2001, defendant UMBS entered into a Qualified Intermediary ("QI") Agreement with the IRS. On June 6, 2001, defendant MTB entered into a QI Agreement with the IRS. The QI Agreements required defendants MTB and UMBS to implement certain documentary procedures to identify clients who invested in U.S. securities, distinguish between customers who were U.S. persons and non-U.S. persons, and properly withhold U.S. taxes.

8.     On December 20, 2000, in anticipation of executing the QI Agreement, defendant MTB entered into a Private Arrangement Intermediate ("PAI") Agreement with defendant Mizrahi Trust Company.  Under the PAI Agreement, Mizrahi Trust Company agreed to implement and comply with the same documentary procedures as MTB and be subject to the same review as MTB.  MTB, as the QI, retained all of the withholding and documentary responsibility for payments made to Mizrahi Trust Company's clients.

9.     Defendant MTB, through its Board of Directors and executives, issued and authorized internal policies and procedures to implement the QI Agreement, which required MTB to

3

follow the laws and regulations governing the requirements of the QI Agreement.

10. Audits from 2002-2012 described deficiencies with defendants MTB's and Mizrahi Trust Company's compliance with the QI and PAI Agreements and internal bank policies, including lack of proper account opening documents, failure to secure required IRS Forms W8-BEN and W9, missing identification documents, lack of information regarding beneficial owners of accounts, inadequate reporting, and failure to block trading in U.S. securities for accounts not in compliance with the QI Agreement requirements.

11. An "undeclared account" was a financial account, owned by an individual subject to U.S. tax and maintained in a country other than the U.S., not reported by the individual account owner to the U.S. government on an income tax return and an FBAR.

12. A "back-to-back loan" was a loan offered by MTB-Los Angeles to U.S. customers secured by funds in an offshore MTB account generally held by the same U.S. beneficial owner (the "pledged account"). Defendant MTB typically charged a 1% to 2% higher rate of interest on the back-to-back loan than the interest rate paid on the pledged account.

13. On December 18, 2007, MTB Roving Representative Joseph "Yossie" Roth ("Roth") was indicted in the Central District of California (Case No. CR 06-775(A)) for conspiracy to defraud the U.S. by impairing and impeding the IRS, mail fraud, conspiracy to commit money laundering, and international money laundering. Roth's specific conduct, as alleged in the indictment and a

4

subsequent superseding indictment, included assisting a U.S. customer to conceal MTB offshore accounts by opening MTB offshore accounts under the names of nominee entities; facilitating financial transactions for a U.S. customer through MTB offshore accounts; and causing MTB to issue "back-to-back loans" to enable U.S. customers' ready access to funds deposited in their undeclared MTB offshore accounts.

14.   On December 18, 2007, Israeli attorney Jacob Ivan Kantor ("Kantor") was indicted with Roth in the Central District of California (Case No. CR 06-775(A)) for conspiracy to defraud the U.S. by impairing and impeding the IRS, conspiracy to commit money laundering, and international money laundering. Kantor's specific conduct, as alleged in the indictment and a subsequent superseding indictment, included creating a Nevis nominee entity and arranging for the use of a New Zealand trust company to conceal an MTB U.S. customer's ownership of an offshore MTB account.

15.   On June 27, 2008, Roth pleaded guilty to conspiring with Kantor and others to defraud the U.S. by impairing and impeding the IRS, in violation of 18 U.S.C. § 371.

B.   OBJECT OF THE CONSPIRACY

16.   Beginning in or about 2002, and continuing thereafter up to at least in or about 2012, in Los Angeles County, within the Central District of California, and elsewhere, defendants MTB, UMBS, and Mizrahi Trust Company, through the actions of their private bankers, relationship managers, and other employees of MTB, UMBS, and Mizrahi Trust Company with similar

levels of responsibility, did unlawfully, voluntarily, intentionally and knowingly combine, conspire, and agree, with each other and with others known and unknown to the United States Attorney, to defraud the United States, by deceitful and dishonest means, for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of a government agency, namely, the IRS, in the ascertainment, computation, assessment, and collection of revenue, namely, income taxes.

C.    MANNER AND MEANS OF THE CONSPIRACY

17.    Certain private bankers, relationship managers, and other employees of MTB, UMBS, and Mizrahi Trust Company with similar levels of responsibility ("employees"), and their co-conspirators, as the manner and means to carry out the object of the conspiracy and to act for the purpose of concealing undeclared accounts from the United States government and the IRS would and did the following, among other actions:

a.    Assisted U.S. customers to open  undeclared accounts at MTB and UMBS;

b.    Used foreign nominee entities, pseudonyms and code names to open and maintain undeclared accounts for U.S. customers at MTB and UMBS;

c.    Referred U.S. customers to attorneys to set up nominee entities in offshore locations such as Nevis, Liberia, Turks & Caicos, and the British Virgin Islands (BVI), which enabled U.S. customers to open offshore undeclared MTB and UMBS accounts in the names of these nominee entities;

d.    Established undeclared accounts for U.S. customers that listed defendant Mizrahi Trust Company as the nominee account holder, which enabled the concealing of the identities of the U.S. beneficial owners of those accounts at MTB;

e.    Opened undeclared accounts at MTB and UMBS for known U.S. customers using non-U.S. forms of identification to avoid identifying the customers as U.S. persons;

f.    Opened and maintain MTB customer accounts without obtaining the required identification and account opening documents, in violation of MTB internal bank policy and MTB's QI Agreement with the IRS;

g.    Failed to secure, in a timely manner, and keep IRS Forms W8-BEN and W9 in certain MTB account files holding securities, and failed to block, in a timely manner, trading in U.S. securities in non-compliant accounts, in violation of MTB's QI Agreement with the IRS;

h.    Failed to correct deficiencies in MTB's compliance with its internal policies and MTB's QI Agreement with the IRS, despite audits from 2002-2012 highlighting MTB's compliance failures;

i.    Entered into "hold mail" agreements with U.S. customers by which defendants MTB and UMBS held bank statements and other account-related mail in their offices in Israel and Switzerland rather than send them to U.S. customers in the U.S., enabling documents reflecting the existence of the undeclared MTB and UMBS accounts to remain outside the U.S. and beyond the reach of U.S. tax authorities;

j.    Entered into agreements with certain U.S. customers to send account statements for undeclared MTB and UMBS accounts to MTB-Los Angeles rather than mail the offshore account statements directly to U.S. customers;

k.    Until 2008, enabled U.S. customers to access and use funds in undeclared accounts by issuing "back-to-back" loans at MTB-Los Angeles to U.S. customers secured by funds in the U.S. customers' undeclared MTB and UMBS accounts;

l.    Deliberately excluded documentation from MTB-Los Angeles loan records, identifying the beneficial owners of undeclared MTB accounts used as collateral for back-to-back loans at MTB-Los Angeles, which enabled documents reflecting the existence of the offshore accounts to remain outside the U.S. and beyond the reach of U.S. taxing authorities;

m.    Purposely excluded identifying information on MTB SWIFT messages from MTB to MTB-Los Angeles confirming funds in undeclared MTB accounts collateralizing the "back-to-back" loans;

n.    Until 2008, periodically sent "Roving Representatives," one from MTB and one from UMBS, to travel to the United States and meet with U.S. customers in Los Angeles, California, New York, and other locations in the U.S. in order to solicit new clients to open accounts, review existing clients' undeclared MTB account statements, and discuss existing clients' undeclared MTB accounts;

o.    Redacted the names of the U.S. customers reflected on copies of MTB bank statements for undeclared MTB and UMBS accounts taken by the MTB Roving Representative when he traveled

to the United States, which preserved the secrecy of those accounts from U.S. taxing authorities;

p.    Communicated with a U.S. customer holding an undeclared UMBS account using coded language to describe banking activities;

q.    Engaged in e-mail communications that excluded the names of U.S. customers in e-mail communications with third party service providers handling offshore undeclared MTB accounts on behalf of U.S. customers in order to preserve the secrecy of those accounts from U.S. taxing authorities;

r.    Advised U.S. customers to avoid investing in U.S. securities to avoid disclosure of their account information to U.S. Tax Authorities;

s.    Despite the December 2007 indictment and June 2008 guilty plea of MTB Roving Representative Roth for conspiring to defraud the U.S. by impairing and impeding the IRS by assisting a U.S. taxpayer in concealing MTB offshore accounts, failed to take sufficient corrective action to address Roth's conduct, failed to undertake an examination of all Roth's U.S. client accounts, and continued to assist U.S. customers to open and maintain MTB offshore undeclared accounts;

t.    Despite the December 2007 indictment of attorney Kantor for assisting a U.S. customer of MTB in the concealment of his ownership of an MTB account by creating a Nevis nominee entity and arranging the use of a New Zealand trust company, and Kantor's continuing failure to appear in the United States, failed to conduct an examination of all MTB accounts connected to Kantor, continued to allow Kantor to appear on MTB accounts,

9

and continued to assist U.S. customers to open and maintain offshore undeclared MTB accounts in the name of offshore nominee entities.

D.   OVERT ACTS

18.   In furtherance of the conspiracy, and to accomplish its objects, certain employees of defendants MTB, UMBS, Mizrahi Trust Company, and others known and unknown to the United States Department of Justice and the United States Attorney, committed and caused others to commit the following overt acts, among others, in the Central District of California and elsewhere:

MTB:

U.S. Customer G.K.

19.   Overt Act No. 1:   In or about 2001, an MTB banker advised U.S. Customer G.K. to change the name of G.K.'s account at MTB to code name "G. Shad" in order to keep it secret from the United States government.

20.   Overt Act No. 2:   From in or about 1997 through in or about 2008, MTB sent U.S. Customer G.K.'s account statements to MTB-Los Angeles, which were either hand delivered to G.K. or were picked up personally by G.K.

21.   Overt Act No. 3:   On or about February 23, 2006, an MTB banker assisted G.K. with opening documents for an account in the name of "Persol" in which G.K. was a signatory. The opening documents included a "hold mail" designation for the delivery of bank statements.

22.   Overt Act No. 4:   Beginning in or about 1997 through in or about 2008, MTB-Los Angeles approved multiple back-to-back

loans for G.K., using the funds in G.K.'s MTB account as collateral.

23.   Overt Act No. 5:  U.S. Customer G.K. filed false individual U.S. Individual Income Tax Returns with the IRS for 2005-2011 that failed to report the existence of, and related income from, G.K.'s undeclared bank accounts at MTB and UMBS. U.S. Customer Z.S.

24.   Overt Act No. 6:  In or about 2001, MTB Roving Representative Roth met with U.S. Customer Z.S. in Beverly Hills, California and discussed opening a secret bank account at defendant MTB and utilizing back-to-back loans from defendant MTB-Los Angeles to access the offshore funds.

25.   Overt Act No. 7:  On or about December 27, 2001, Israeli attorney Kantor assisted U.S. Customer Z.S. in creating a Nevis foreign nominee entity.

26.   Overt Act No. 8:  On or about January 6, 2002, U.S. Customer Z.S. opened an account at defendant MTB in the name of the foreign nominee entity.

27.   Overt Act No. 9:  On or about January 28, 2002, MTB accepted a transfer by Z.S. from an account in China of at least $100,000 into Z.S's MTB account.

28.   Overt Act No. 10:  Beginning in or about 2003, and continuing through in or about 2008, MTB-Los Angeles approved multiple back-to-back loans to Z.S. with principal balances of up to $2.5 million, using funds in Z.S.'s MTB account as collateral.

29.   Overt Act No. 11:  U.S. Customer Z.S. filed false individual U.S. Individual Income Tax Returns with the IRS that

failed to report the existence of, and related income from,
Z.S.'s undeclared bank accounts at defendant MTB.

U.S. Customer J.F.:

30. <u>Overt Act No. 12:</u> In or about December 1989, an MTB
Banker opened an account for known U.S. customer J.F. in the
name of a Liberian corporation, with Israeli attorneys as
signatories.

31. <u>Overt Act No. 13:</u> In or about July 2003, an MTB
banker, well knowing that J.F. was a controlling shareholder of
the entity account holder, accepted an attorney's "Declaration
With Respect to the Beneficiary in an Account" for J.F.'s
account that stated there were no beneficiaries of the account
other than the offshore corporation.

32. <u>Overt Act No. 14:</u> In or about September 2003, an MTB
banker accepted a passport for J.F. and a form signed by an
attorney for J.F. stating that J.F. was a controlling
shareholder of the foreign entity accountholder.

33. <u>Overt Act No. 15:</u> On or about December 19, 2007, Roth
met with J.F. in Los Angeles, California.

34. <u>Overt Act No. 16:</u> In or about December 2007, an MTB
banker renewed J.F.'s pledge of $5 million for a back-to-back
loan in Los Angeles.

35. <u>Overt Act No. 17:</u> On or about December 21, 2007, an
MTB relationship manager sent an e-mail to J.F.'s attorney
requesting a completed Form W-8BEN because the account held U.S.
securities.

36. <u>Overt Act No. 18:</u> On or about January 9, 2008, MTB
bank employees exchanged e-mails stating that: 1) they had sent

12

three e-mails to J.F.'s attorney requesting a Form W-8BEN; 2) a Form W-8BEN was never received; 3) it would be necessary to withhold 28% of the overall proceeds of the U.S. securities in the account; and 4) not providing the requested documentation could negatively affect the Bank's status with U.S. taxing authorities.

37.   Overt Act No. 19:   On or about February 11, 2011, an MTB banker sent an e-mail stating that the Form W-8BEN was missing from the account because J.F. had refused to sign the Form W-8BEN.

38.   Overt Act No. 20:   From 2007 to 2009, MTB, well knowing that J.F. was a U.S. customer, allowed J.F. to hold U.S. securities without a Form W-8BEN in the account file and without withholding 28% of the proceeds of the securities or freezing the account, as required by the 2001 MTB QI Agreement with the IRS.

U.S. Customer R.S.:

39.   Overt Act No. 21:   On or about April 2, 2001, MTB bankers opened an account for R.S., a known U.S. Customer, under the code name "Lulu."

40.   Overt Act No. 22:   On or about May 7, 2011, MTB bankers removed R.S.'s U.S. address from the account at R.S.'s request and replaced the address with an Israeli address.

U.S. Customer L.D.:

41.   Overt Act No. 23:   On or about November 25, 1999, MTB bankers opened an account for L.D., a known U.S. customer, in the name of an offshore entity incorporated in the British Virgin Islands.

42.   Overt Act No. 24:   On or about November 25, 1999, account-opening documents were forwarded to the MTB legal department for approval.

43.   Overt Act No. 25:   Until at least December 2013, MTB, well knowing that L.D. was a U.S. customer, permitted L.D. to trade in U.S. securities without withholding 28% of the proceeds of the trades or freezing the account, as required by the 2001 MTB QI Agreement with the IRS.

**U.S. Customer S.M.:**

44.   Overt Act No. 26: On or about August 16, 2006, MTB bankers opened an account for S.M., a known U.S. customer, in the name of a Nevis offshore company.

45.   Overt Act No. 27:   On or about August 30, 2006, MTB bankers, well knowing that S.M. was a controlling shareholder of the entity account holder, accepted an attorney's "Declaration with Respect to Beneficiaries in an Account" that stated that there were no beneficiaries of the account other than the offshore corporation.

**Mizrahi Trust Company:**

**U.S. Customer S.E.:**

46.   Overt Act No. 28:   On or about July 26, 2005, an MTB banker opened an account for S.E., a known U.S. customer, in the name of Mizrahi Trust Company, with the named beneficial owner a Nevis offshore entity created by Israeli attorney Kantor.

47.   Overt Act No. 29:   On or about May 11, 2006, MTB granted S.E. a $550,000 line of credit in the name of Mizrahi Trust Company in order to trade securities.

48.   **Overt Act No. 30:**   In or about September 2008, a MTB banker closed the account and transferred all of the money to bank accounts in China.

MTB-Cayman Islands:

U.S. Customer A.C.

49.   **Overt Act No. 31:**   On or about January 6, 1995, MTB assisted U.S. Customer A.C. in creating a foreign nominee entity incorporated in the British Virgin Islands.

50.   **Overt Act No. 32:**   In or around late 2002 or early 2003, MTB contacted U.S. Customer A.C. in Los Angeles, California, and informed A.C. that he needed to close his MTB account because it was risky to maintain an account in the name of a British Virgin Islands entity.

51.   **Overt Act No. 33:**   On or about February 28, 2003, an MTB banker assisted U.S. Customer A.C. in opening a new bank account in the name of a Cayman Island entity at MTB-Cayman Islands.

52.   **Overt Act No. 34:**   On or about April 8, 2003, in Los Angeles, California, an MTB banker provided U.S. Customer A.C. a letter instructing MTB-Cayman Islands to transfer all the existing funds in A.C.'s old MTB-Cayman Islands account to A.C.'s new MTB-Cayman Islands account, and to then close the old account.

53.   **Overt Act No. 35:**   From in or about 2002 through in or about 2007, U.S. Customer A.C. met MTB Roving Representative Roth once or twice a year in Los Angeles, California to review bank statements relating to A.C.'s undeclared accounts at MTB-Cayman Islands.

54.  <u>Overt Act No. 36:</u>  Between on or about January 19, 2006 and on or about January 4, 2008, in Los Angeles, California, MTB-Los Angeles approved three back-to-back loans for A.C. totaling over $3.3 million.

55.  <u>Overt Act No. 37:</u>  On or about October 14, 2009, in Los Angeles, California, U.S. Customer A.C. filed a U.S. Individual Income Tax Return, Form 1040, for tax year 2008 with the IRS that failed to report the existence of, and related income from, A.C.'s undeclared bank accounts at defendant MTB-Cayman Islands.

**MTB-UMBS:**

**UMBS Customer #1**

56.  <u>Overt Act No. 38:</u>  On or about April 8, 2010, a UMBS banker opened an account with a Russian passport with transfers from an account previously opened by the same client using a U.S. passport.

57.  <u>Overt Act No. 39:</u> On or about April 9, 2010, after the transfers were made to the account opened with a Russian passport, an MTB banker closed the U.S. related account opened with a U.S. passport.

58.  <u>Overt Act No. 40:</u>  On or about April 8, 2010, a UMBS banker accepted a form from the U.S. person, who opened the account with a Russian passport, stating that the customer was not a U.S. person even though the UMBS banker knew that the account holder was a U.S. person.

59.  <u>Overt Act No. 41:</u>  On or about April 8, 2010, a UMBS banker noted in the file that the account holder was going to renew his Russian passport because of the "U.S. problem."

**UMBS Customer #2**

60. <u>Overt Act No. 42:</u>  On or about June 22, 2010, a UMBS banker opened a non-U.S. related account with transfers from a U.S. related account.

61. <u>Overt Act No. 43:</u> On or about June 23, 2010, a UMBS banker closed the U.S. related account that transferred the money to the non-U.S. related account.

62. <u>Overt Act No. 44:</u>  On or about June 22, 2010, a UMBS banker accepted documents from the U.S. person, who transferred the money from the U.S. related account to the non-U.S. related account, appointing the U.S. person to be the Power of Attorney on the non-U.S. related account.

**UMBS Customer #3**

63. <u>Overt Act No. 45:</u>  On or about June 22, 2010, a UMBS banker noted in the account file that the account holder wanted to break U.S. contact and to transfer all funds to a new account and close the old one.

**Coded e-mails**

64. <u>Overt Act No. 46:</u>  Between on or about October 4, 2011 and January 23, 2012, a UMBS banker exchanged multiple e-mails with a U.S. customer using the code words "shoes" to refer to offshore funds and the phrase "shoes in the right box" to refer to transferring offshore funds to another account.

65. <u>Overt Act No. 47:</u>  On or about January 22, 2010, a UMBS banker sent an e-mail to another MTB banker stating "[c]ould you contact the gentleman again who "lives with you"

and "does not have a passport"?  We are expecting a package of

70 Mickey Mice for him at the end of the week."


TRACY L. WILKISON
Attorney for United States
Acting Under Authority Conferred
By 28 U.S.C. Section 515



LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division



THOMAS D. COKER
Assistant United States Attorney
Chief, Tax Division


LARRY J. WSZALEK
Chief
MELISSA S. GRINBERG
LISA L. BELLAMY
Trial Attorneys
U.S. Department of Justice, Tax Division

**STATEMENT OF FACTS**

The conduct discussed in this Statement of Facts occurred from in or about 2002 through in or about 2012.

**ENTITIES INVOLVED IN THE OFFENSE**

1.   Mizrahi-Tefahot Bank Limited (MTB) was a public company, registered with the Registrar of Companies in Israel and traded on the Tel-Aviv Stock Exchange. MTB was one of Israel's largest banks. Throughout the relevant period, MTB had approximately 4400 employees, the majority working in its consumer lending and retail banking operations within Israel. MTB was regulated by the Bank of Israel. As of December 31, 2017, MTB had approximately $69.1 billion in assets.

       A. The Los Angeles, California, branch of MTB (MTB-LA) was established in 1981 and was regulated by the Federal Deposit Insurance Corporation (FDIC), the California Department of Business Organizations, Division of Financial Institutions, and the Bank of Israel. A branch manager in Los Angeles, California, operated MTB-LA, which throughout the relevant period had no more than thirty-two (32) employees.

       B. The Cayman Islands branch of MTB (MTB-Cayman Islands) was established in 1978 and was regulated by the Cayman Islands Monetary Authority (CIMA) and the Bank of Israel.  The back office operations of the branch were handled by the Cayman Islands Operations Unit in Tel Aviv, Israel, overseen by a manager and no more than three (3) employees.  In 2014, MTB-Cayman Islands surrendered its license to CIMA and was closed.

1

**EXHIBIT C**

C. The London branch of MTB (MTB-London) was established in 1983 and was regulated by the Prudential Regulation Authority (PRA) of the Bank of England, the UK Financial Conduct Authority (FCA), and the Bank of Israel. MTB-London was operated by a branch manager in London, England, and had approximately forty-five (45) employees during the relevant period.

2.   The Trust Company of Mizrahi Bank (Mizrahi Trust Company) was a subsidiary fully owned by MTB. Mizrahi Trust Company was regulated by the Bank of Israel. Mizrahi Trust Company was founded in 1964.  It had approximately eleven (11) employees during the relevant period.

3.   United Mizrahi Bank (Switzerland) Ltd. (UMBS), established in 1980, was a subsidiary fully owned by a subsidiary holding company of MTB, and operated as one branch in Zurich, Switzerland.  It had approximately fifteen (15) employees during the relevant period.

4.   MTB, Mizrahi Trust Company, and UMBS provided private banking, wealth management, and other related financial services to high-net-worth individuals and entities around the world, including citizens, resident aliens, and permanent residents of the United States located in the Central District of California and elsewhere.

5.   MTB, Mizrahi Trust Company, and UMBS were responsible under U.S. law for the acts and omissions of their employees as described in this Statement of Facts.

## U.S. INCOME TAX AND REPORTING OBLIGATIONS

6.    U.S. citizens, resident aliens, and legal permanent residents had an obligation to report all income earned from foreign bank accounts on their tax returns and to pay the taxes due on that income. Since at least 1980, U.S. citizens, resident aliens, and legal permanent residents had an obligation to report to the Internal Revenue Service (IRS) on Schedule B of a U.S. Individual Income Tax Return, Form 1040, whether they had a financial interest in, or signature authority over, a financial account in a foreign country in a particular year by checking "Yes" or "No" in the appropriate box and identifying the country where the account was maintained.

7.    Since 1970, U.S. persons (citizens, residents, and entities) who had a financial interest in, or signature authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a particular year were required to file a yearly Report of Foreign Bank and Financial Accounts (FBAR) with the Department of the Treasury.

8.    An IRS Form W-8BEN, Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding and Reporting, was used by a non-U.S. person to establish foreign status and beneficial ownership, and to claim the benefits of exemption or reduction of tax withholding as a resident of a foreign country with which the United States has an income tax treaty. U.S. citizens and U.S. residents were not eligible to file a Form W8-BEN.

3

1      9.   An IRS Form W-9, Request for Taxpayer Identification

2   Number and Certification, was used by a U.S. person to provide a

3   correct Taxpayer Identification Number to a financial institution

4   required to report to the IRS interest, dividends, and other

5   interest earned.

6                **QUALIFIED INTERMEDIARY AGREEMENTS**

7      10.   Beginning in 2000, MTB implemented KYC policies and

8   procedures designed to comply with Israel's AML, KYC and Anti-

9   Terrorism laws and regulations. The KYC procedures required MTB

10   to identify and document the true beneficial owner of a bank

11   account, enter the details of identification into a computerized

12   database, implement an account opening approval process for high-

13   risk accounts, maintain customer files with proper KYC

14   documentation, and meet its reporting obligations per Israeli

15   laws and regulations.

16      11.   On January 21, 2001, defendant UMBS entered into a

17   Qualified Intermediary (QI) Agreement with the IRS.

18      12.   On June 6, 2001, defendant MTB entered into a QI

19   Agreement with the IRS. MTB applied its existing KYC policies in

20   its QI Agreement with the IRS. MTB advised its employees that,

21   "It is of great importance to stringently follow these provisions

22   since they constitute the basis to granting 'Qualified

23   Intermediary' status to Bank Mizrahi on behalf of the American

24   Internal Revenue Service."

25      13.   Additionally, Mizrahi Trust Company entered into a

26   companion Private Arrangement Intermediary (PAI) Agreement with

27   MTB, whereby Mizrahi Trust Company agreed to implement and comply

28   with the same documentary procedures as MTB and be subject to the

1   same review as MTB.  MTB, as the QI, retained all of the

2   withholding and documentary responsibility for payments made to

3   Mizrahi Trust Company's customers.

4       14.  The QI and PAI Agreements required defendants MTB,

5   UMBS, and Mizrahi Trust Company to implement certain documentary

6   procedures to identify customers who invested in U.S. securities,

7   distinguish between customers who were U.S. persons and non-U.S.

8   persons, obtain the proper IRS Forms W8-BEN and W-9 (or

9   equivalent forms) from customers, and properly withhold U.S.

10  taxes.

11      15.  The purpose of the QI and PAI Agreements was to allow

12  MTB, UMBS, and Mizrahi Trust Company to assume responsibilities

13  for the withholding of U.S. federal income taxes on gross income

14  from U.S. sources, including interest, dividends, royalties and

15  capital gains on accounts that held U.S. securities. The

16  Agreements required MTB, UMBS, and Mizrahi Trust Company to: (i)

17  implement adequate procedures, accounting systems, and internal

18  controls to ensure compliance; (ii) document any accounts that

19  were lacking the proper information in the account files; (iii)

20  timely file the proper forms with the IRS including information

21  about the account holders; and (iv) report all accounts that

22  could generate reportable payments to the IRS.

23      16.  MTB (and by adoption Mizrahi Trust Company) and UMBS

24  established bank policies and procedures for complying with the

25  QI and PAI Agreements. These policies required U.S. customers,

26  who held U.S. securities in MTB and UMBS accounts, to either sign

27  an IRS Form W-9 or authorize MTB or UMBS to withhold and remit

28

31% of any income received from U.S. securities dividends, interest, and gains to the IRS.

17.  These bank policies also required foreign corporations, holding U.S. securities, to sign an IRS Form W-8BEN to establish both the foreign status and beneficial owner of the account, and to claim an exemption or income tax treaty benefits for income received from U.S. securities dividends, interest and gains. Existing U.S. customers and foreign corporations who refused to sign IRS Forms W-9 or W-8BEN were to have their accounts blocked from transacting in U.S. securities by January 1, 2001.

18.  These policies further barred the opening of any new accounts holding U.S. securities if the U.S. customer or foreign corporation refused to sign an IRS Form W-9 or Form W-8BEN.

19.  Despite MTB policy and procedures, for years following the QI and PAI Agreements, certain MTB employees failed to identify customers holding U.S. securities as U.S. persons, and repeatedly failed to fully comply with MTB KYC policy requiring proper documentation for opening and maintaining accounts holding U.S. securities. MTB employees also failed to block in a timely manner U.S. securities-related activity in accounts for U.S. customers and foreign corporations, who refused to sign an IRS Form W-9 or W-8BEN.

20.  Even after entering into the QI and PAI Agreements in 2000 and 2001, MTB, UMBS, and Mizrahi Trust Company employees enabled certain U.S. customers to transfer assets from their individual accounts at MTB and UMBS to accounts in the name of foreign nominee corporations and avoid filing the proper IRS Form W-9.  Instead, the foreign nominee corporation submitted an IRS

6

1   Form W-8BEN, claiming the beneficial owner of the account was an

2   exempt foreign person not subject to U.S. tax withholdings.

3                     **THE OFFENSE CONDUCT – OVERVIEW**

4        21.   Certain private bankers, relationship managers, and

5   other employees of MTB Entities with similar levels of

6   responsibility acted in disregard of MTB's policies and

7   procedures and assisted U.S. customer-taxpayers in concealing

8   their ownership and control of assets and funds held in MTB and

9   UMBS bank accounts, which enabled those U.S. taxpayers to evade

10  their U.S. tax obligations. MTB and UMBS are accepting

11  responsibility under U.S. *respondeat superior* law for the

12  following actions of these employees:

13    a. Assisted and referred U.S. customers to professionals to

14       open and maintain accounts at MTB and UMBS in the names of

15       pseudonyms, code names, Mizrahi Trust Company, and foreign

16       nominee entities in offshore locations, such as St. Kitts

17       and Nevis (Nevis), Liberia, Turks & Caicos, and the British

18       Virgin Islands (BVI), and by doing so, enabled those U.S.

19       taxpayers to conceal their beneficial ownership in the

20       accounts and maintain undeclared accounts at MTB and UMBS;

21    b. Opened and maintained customer accounts at MTB and UMBS for

22       known U.S. customers using non-U.S. forms of identification,

23       and in some instances failed to maintain copies of the

24       required identification and account opening documents, which

25       enabled U.S. taxpayers to avoid being identified as U.S.

26       persons in violation of MTB internal bank policy and QI

27       Agreement with the IRS;

28

                                  7

c. Entered into "hold mail" agreements with U.S. customers
   whereby MTB and UMBS employees held bank statements and
   other account-related mail in their offices in Israel and
   Switzerland, and by doing so enabled  documents reflecting
   the existence of the offshore accounts to remain outside the
   U.S.;

d. Communicated with U.S. customers holding undeclared UMBS
   accounts using coded language and excluded the names of U.S.
   customers in e-mail communications regarding UMBS customers
   in order to preserve the secrecy of those accounts;

e. Until 2008, provided U.S. customers at MTB-Los Angeles
   access to and use of their funds held in non-U.S. MTB and
   UMBS accounts through back-to-back loans, while excluding
   any record of the U.S. customer's offshore pledge accounts
   at MTB or UMBS, which allowed certain U.S. customers to take
   advantage of Israeli and Swiss privacy laws and not disclose
   their pledge accounts to U.S. tax authorities;

f. Failed to adhere to the requirements of MTB's QI Agreement
   by (i) permitting U.S. customers who had not provided MTB
   with the proper IRS Forms W-8BEN and/or W-9 to continue
   trading in accounts holding U.S. securities, (ii)
   transferring assets to foreign entity accounts controlled by
   U.S. customers to avoid the proper QI reporting
   requirements, and (iii) failing to timely address compliance
   deficiencies in U.S. customer accounts holding U.S.
   securities;

g. Until 2008, periodically sent "Roving Representatives," one
   from MTB and one from UMBS, to the United States to solicit

8

new customers and to meet with existing U.S. customers in
Los Angeles, California, New York, and other locations in
the U.S. for the purposes of opening accounts and
surreptitiously reviewing and managing existing customers'
offshore accounts by, among other things, redacting the
names of both the bank and the U.S. customers from the bank
statements under review.

## U.S. CUSTOMER ACCOUNT OPENINGS

22.  Certain MTB employees assisted U.S. customers in
concealing their accounts and identities from U.S. tax
authorities by utilizing certain account features that they knew,
or should have known, would assist U.S. customers in maintaining
undeclared accounts. For example, MTB employees opened accounts
for U.S. customers using pseudonyms or code names; opened
accounts in the name of  Mizrahi Trust Company; opened accounts
in the names of offshore companies and entities that purported to
be non-U.S. persons exempt from U.S. tax laws; advised U.S.
customers to avoid investing in U.S. securities to avoid
disclosure of their account information to U.S. Tax Authorities;
and failed to adhere to MTB's Know Your Customer (KYC) policy by
not keeping copies of passports or account opening documents in
account files.

23.  In 2010 and 2011, a UMBS employee knowingly assisted
U.S. customers in maintaining their anonymity from the IRS by:
(1) transferring U.S. customer funds to a non-U.S. account in the
same U.S. customer's name but using solely a non-U.S. passport;
(2) transferring U.S. customer funds to a non-U.S. account where

9

the U.S. customer then had power of attorney authority over the account; (3) enabling a U.S. customer to open an account with a non-U.S. beneficial owner, in the name of a foreign nominee entity, and where the U.S. customer had power of attorney; (4) communicating with a U.S. customer in code by referring to the transfer of that U.S. customer's funds as sending the "shoes" to the "right box."

24.   In 2012 and later, an MTB employee knowingly assisted a few U.S. customers with maintaining their anonymity from the IRS by, for example, (1) advising a customer seeking to transfer funds to an MTB account in the name of a family member, following communications from the customer that he sought to effectuate such a transfer "due to limitations on U.S. residents"; (2) informing an existing U.S. citizen and Israeli resident client that he could sign on a W-8 form rather than a W-9; and (3) assisting the transfer of funds from a jointly owned MTB account in the name of a U.S./non-U.S. couple to an individually owned account in the name of solely the non-U.S. spouse thereby enabling the couple to avoid payment of taxes to the IRS.

**BACK-TO-BACK LOANS**

25.   Until 2008, MTB, through its employees, agreed to offer, market and service back-to-back loans that U.S. taxpayers used to access their funds in the offshore accounts and continue to conceal their assets and evade their U.S. tax obligations.

26.   A "back-to-back loan" was a loan issued by MTB-LA that was secured or collateralized by funds held in an account at MTB (pledge account). The loan applicant (borrower) at MTB-LA and the owner of the pledge account at MTB were the same person. MTB

10

employees who prepared the loan documents and approved the back-to-back loan were aware in some cases that the borrower and owner of the pledge account were the same person.

27.  MTB paid interest on the pledged accounts that was generally above the market rate until at least 2004 and continued this practice for select customers until at least 2008.  MTB-LA issued loans to the borrower that charged interest rates 1% to 2% per annum above the interest paid on the pledged account.

28.  In 2002, MTB requested legal advice regarding the use of back-to-back loans by U.S. customers, specifically, "whether such loans raise any tax avoidance concerns under United States law." The legal advice stated that both the loan interest rate and interest earned on the pledge account must be set at established market rates, and that the back-to-back loans would not be viewed as being used for tax avoidance provided the borrower took into account interest paid on the pledge account for United States tax purposes. MTB neither distributed this legal advice to MTB-LA employees, who managed or serviced back-to-back loans that offered above-market interest rates, nor to MTB employees in Israel, who serviced or managed the pledge accounts that offered above-market interest rates.

29.  In 2004, an audit found that MTB Cayman Islands' practice of granting back-to-back loans to Single Purpose Vehicle Companies ("SPVs") was so deficient that the bank assumed additional risks "that may expose it to … potential reputational damage."  The 2004 audit referring to the years 2002-2003 examined MTB-Cayman Islands' documentation located in the Operations Unit in Tel Aviv for granting loans for customers, and

11

found "no identifying details of the owners of companies receiving back-to-back loans" and no "evidence that the Cayman Branch took measures to determine the real identity of the account holders and the beneficiaries responsible for it." The audit report further opined that payment of interest on a foreign currency deposit at the rate of Libor +3% per annum while interbank interest at the time of the deposits was at the rate of Libor represented "an exceptional payment lacking any connection to the market interest on deposits of the same type."  This deficiency was corrected in 2004.

30.  MTB-LA kept no documentation, account records, or information that identified the owner of the pledged account. Likewise, MTB did not identify the person who owned the pledged account by name or account number. For example, the "SWIFT message" that confirmed the collateral account for the back- to- back loan would generally refer to the pledged account by an unassociated reference number and would not identify either the name of the pledged account or the beneficial owner of the pledged account.

31.  MTB required very little financial information from the borrower applying for the back-to-back loan. U.S. customers submitted personal financial statements that did not disclose the existence of their foreign bank accounts, including the pledged account, and often submitted their personal tax returns to MTB-LA that omitted ownership of the pledged account. Likewise, MTB-LA loan officers prepared memoranda for MTB-LA's credit committee that did not identify the pledged account. Instead, the credit memoranda referenced an "off balance sheet" deposit or pledge;

noted that the U.S. customer had a "positive history" with the bank; and/or only identified the pledged account for the loan as "pledged collateral in UMTB system."

32.   In 2007, the Federal Deposit Insurance Corporation (FDIC) conducted a review of MTB-LA's compliance with the Bank Secrecy Act (BSA), including the branch's Anti-Money Laundering program. In August 2008, the FDIC issued a Cease and Desist Order requiring MTB-LA not to make or renew any back-to-back loans or any other similar extensions of credit unless MTB-LA reviewed and maintained copies of all records concerning collateral, including records documenting the owner of a foreign pledged account. MTB ceased offering back-to-back loans to U.S. customers in 2008 and called all existing back- to-back loans.

33.   MTB and UMBS employees enabled U.S. customers to conceal their foreign accounts and enabled U.S. customers to access those accounts in the U.S. through back- to-back loans. Five of MTB's U.S. customers pleaded guilty in 2013 and 2014 to U.S. felony criminal tax charges, which in the case of four of the five included admissions to conspiracy to defraud the IRS and filing false federal income tax returns. Each of the five U.S. customers who pleaded guilty opened an account in the name of a foreign nominee entity in order to conceal the account from the U.S. government, and each of the U.S. customers accessed those funds by taking out a back-to-back loan at MTB-Los Angeles using his or her MTB foreign account as collateral. All five of the U.S. customers, who pleaded guilty to tax crimes, met with MTB Roving Representative Roth, and three of the U.S. customers' entities were created by Israeli attorney Kantor.

13

### MTB'S COMPLIANCE PRACTICE

34.   Based on audit reports, MTB's failure to fully comply with its KYC policies and procedures persisted for the entirety of the relevant time period from 2002 through 2012.

35.   During the relevant period, from 2002 through 2012, various audits of all three entities, MTB, Mizrahi Trust Company, and UMBS, disclosed numerous and persistent deficiencies regarding compliance with both KYC and Anti-Money Laundering policies and procedures.

36.   In 2004, an audit found that the compliance failures by MTB-Cayman Islands were such that it became necessary to consider whether to discontinue operations in MTB-Cayman Islands due to the deficiencies and the exposure to the risks inherent to its activity.

37.   In 2005, an audit found that Mizrahi Trust Company did not take sufficient steps required for preparing for the implementation of the provisions of the Bank of Israel's Anti-Money Laundering Order and therefore "blatantly violated" the legal obligations imposed upon it by the law, the order, and the regulations. The audit found that Mizrahi Trust Company made no decisions of any kind on the issue. An audit report found that "[Mizrahi Trust Company's] insufficient investment in manpower in the money laundering prohibition area is the cause for the failings."

38.   In 2009, an audit found that the MTB-Cayman Island's computer system did not block U.S. securities activity by corporations that did not execute the required IRS Form W8-BEN, thus enabling a few customers trading in U.S. securities to

14

continue without the required documentation required by the terms of the QI.

39.  In 2010, an audit of MTB-Cayman Islands noted that of paramount concern is MTB-Cayman Islands failure to correct irregularities with the identity of the beneficiary in private accounts and the controlling shareholder in corporate accounts that had been flagged as an issue previously in June 2008.

40.  In 2012, the Bank of Israel imposed a $975,000 civil money penalty against MTB for AML compliance failures.

41.  Another audit covering the period 2007 to 2010 noted MTB's compliance failures in concluding that, due to the volume and nature of the deficiencies, there existed problems with MTB's corporate culture and sensitivity to risks inherent in the subject of Anti-Money Laundering.

42.  These compliance failures by certain MTB employees, which enabled U.S. customers to avoid their U.S. tax obligations, are illustrated in the cases detailed below. All of the above compliance deficiencies either have been remediated or are in the process of being remediated in the normal course and ongoing compliance actions of MTB.

43.  In 1989, an MTB employee opened an account for a U.S. customer in the name of a foreign corporation incorporated in Liberia, the incorporation of which was transferred to the Marshall Islands in 2001. The U.S. customer had a longstanding pre-existing relationship with MTB and this account had a year-end high value of approximately $75 million. MTB employees permitted the account to trade in U.S. securities, in violation of the QIA, despite numerous failed attempts as late as 2010 to

have the client complete an IRS Form W-8BEN or W-9, during which they noted that the "client refuses to sign."

44.   In 2004, an MTB employee advised a longstanding U.S. customer that it was dangerous to continue to hold funds in his current undeclared account at MTB-Cayman Islands in the name of a BVI entity due to increased scrutiny.   The MTB employee suggested transferring the funds to a different entity and assisted the U.S. customer with opening a new, hold-mail account at MTB-Cayman Islands in the name of a Turks and Caicos Island entity. One to two times per year, the U.S. customer received visits at his office in the United States from MTB Roving Representative Roth to review his MTB-Cayman Islands bank statements.

45.   Even after the indictment of Roth and Kantor and the five guilty pleas of MTB U.S. customers, MTB took insufficient steps to investigate accounts managed by Roth and Kantor. MTB only reviewed the account that appeared in Roth's indictment to determine whether to take corrective action. MTB did not audit the entirety of accounts with which Roth and Kantor were associated.

16